12-59-47 Christopher R. Boudet et al. v. HomeServices of America, Inc. et al. Coldwell Bankers and the Expanded Company Moral Argument as follows 15 minutes for the Plaintiffs 15 minutes for each jury Mr. Lovell for the Plaintiffs May it please the Court, Christopher Lovell and I reserve three minutes for rebuttal. That's fine. In this case, Your Honors, the first issue is, I believe, what is an agreement in restraint of trade? How do we define it? In this circuit, in the Midwifery case, quoted U.S. v. Tobacco, and it's since been followed, you show, it's not like a formal enforceable contract in court to show an unlawful agreement or conspiracy. You show a unity of purpose shared by the alleged agreeers, a common design, or a meeting of the minds. Any of the three will suffice. Now, in this case, the United States Department of Justice filed a complaint under Section 1 against the Kentucky Real Estate Commission, alleging that the commission's anti-rebate rule was the product of a conspiracy or agreement among the commissioners and other persons, and that it facilitated price fixing. The record in the case showed that when Mr. McMahon, Defendant Coldwell Banker McMahon, heard about the DOJ suit, his first comment was, who is the informant or cooperating witness for the DOJ? I respectfully submit that the record we put forth here in a transcript from the Holiday Inn meeting answered Mr. McMahon's question that it was Mr. McMahon, and that the DOJ saw what went on in this transcript at this meeting and said, and brought suit, this is being abused. Now, the plaintiffs say that a reasonable juror could have construed the transcript to find either this unity of purpose between Mr. McMahon and the next speaker, Mr. Myers, who is from Defendant Seminent, or a common design, and I'd just like to go to the words that the plaintiffs rely on, of which there is a transcript. Mr. McMahon, now the court quoted this at length in the decision that we're appealing from, and we quoted parts of it. The court said that we quoted out of context, but we quoted the pertinent parts. And again, this is a meeting held by the Kentucky Real Estate Commission. It's attended by all of these brokers. Didn't Mr. McMahon want to compete? I don't think, no, Your Honor, not at all. Well, at the commission he was against, he wanted the ban repealed. No. That would be competition. No, he wanted it to be kept in the part of his remarks that were proper to speak about what was the subject of the day, but like lots of... I'll re-read it, but I thought he made his comment about we don't want to cut our commissions, but then when you read on further, he doesn't like the ban. He thinks we ought to compete with toasters, but not with commissions, the way I read his thing. Well, that part is in there, but the other, no, I don't think that other part... He also, a lot of his focus is really on the fact that he believes that full service brokers, or whatever you call them, are offering service of an entire different quality from that being offered by internet brokers. And he thinks that they have to rely on their quality of service rather than cutting commission rates in order to compete, that they need to focus on the services they provide rather than on what the commission rate is. And that would be an entirely permissible construction of what he's saying. Judge Gibbons, I agree that if he had stopped, if his words weren't what his words were, I agree that he should be able to talk about professionalism, but let's put a reasonable juror. The U.S. Department of Justice brings suit and says he's the commissioner, and he's the leading broker. Adam Smith said in The Wealth of Nations, the invisible hand does not work when members of the same trade or business get together. The public interest always suffers. So you come into a meeting for one reason. The transcript's being taken, but the internet is coming in to threaten your business. Purposes within purposes. What is the purpose? That's for the jury.  That's for the jury. What are the words? Now, that can't change. And we quote, obviously we quote the words that relate to commissions. Mr. McMahon doesn't say, you know, don't do any rebates, or let's just deal with the rebate rule. Mr. McMahon says as follows, but with the latest convention, there's 125 for sale by owner sites that's on the web now that's competing for our business. For sale by owner is somebody just trying to sell their own house. My competition is not, and he names certain people, including defendant Semonite here in Louisville. We go to the same meetings together. We. Our people are honorable. Our people. Our competition, that's people competing with us, is the unknown, and that's the internet. He says, you know, people can come across the internet and take our clients for $499. In my opinion, the most unprofessional thing we can do in the business is cut our commission. I think we ought to be worth what we charge in the services that we offer. Now, that's actually against the antitrust laws. Some rabid people from the Department of Justice would argue because you want to have good quality service and be more efficient and not raise your, not, but the full, Judge Gibbons, you're right. I think you could say we want professionalism. That's what they did forever. Well, it wasn't just a professionalism issue. It's just a, you know, it's kind of a, you know, the rates might be lower on the internet, but the quality of service is correspondingly lower, and he could be seen to be addressing a service issue without necessarily, at the point I referred to, without necessarily be adjusting an amount of commission issue. Yes, and I tried to say I agree with that before, but the cheerleading to the group before as a leading person, don't cut our commission, but I'm not reducing my commissions. That's not rebates. That is for the jury. Any reasonable juror. All right, now he's followed by Mr. Myers before I start getting the violin out here. Mr. Myers says, I think competition is good for both. Mr. Myers is from Defendant Seminen. Defendant Seminen is the largest broker in Louisville. I think the competition is good for both us and the consumer. I'd like to see our competition between us, our fellow horizontal competitors, who you're not supposed to talk about with prices ever. I'd like to see our competition based on our professional performance, not upon our brokerage fees, which along the lines of using a more professional image, whereas Mr. McMahon emphasized the negative, most unprofessional thing we do would be to cut our commissions. Mr. Myers is coming at it from this way, but the two are dovetailing, which along the lines of using a more professional image. I'd like to see us talk about our brokerage fees as opposed to our commission. Now, let's go back to the definition, if you will indulge me. Is this hearing your best evidence? Well, I've never had evidence like it before, but under the Spirit case, I think it's the best. But I've got some more points in the argument where under the Spirit case that came down and actually the dairy farmers case that came down more recently, this court has been very firm that where an expert opinion is in on a point and supported by evidence, summary judgment is not appropriate either, and we think we fit right into that hole as well. But the traditional theory. Let's talk about the expert, if you don't mind, now that you mentioned it. Neither of your experts broach the point of whether there could be legitimate reasons for the outcome that he finds. And my understanding of the case law is from the United States Supreme Court, you have to not only for an inference to be admissible in an antitrust case, it has to tend to exclude a legitimate individual type of decision, and neither of your experts address that at all. Now, that doesn't affect admissibility, but I'm trying to figure out how that would block summary judgment. Because it doesn't address that at all. It doesn't address legitimate reasons for the conduct that they found. Well, let me say, Your Honor, that first, there's two parts to that, if I would break it down in my way, is what does the Supreme Court say about tends to exclude, which I'd like to read to Your Honor. This is the Eastman-Kodak case, and they say the requirement, this is 1992, which is after one of Your Honor's decisions, Judge Norris interpreting Matt Sushida, I think maybe the first decision by this circuit. But in 1992, then, the Supreme Court came back and said as follows in the Eastman-Kodak case. This is at 468. The court's requirement in Matt Sushida that the plaintiff's claims make economic sense did not introduce a special burden on plaintiffs facing summary judgment in antitrust cases. The court did not hold that if the moving party enunciates any, and the court is emphasizing the word, any economic theory supporting its behavior, regardless of its accuracy in reflecting the actual market, it is entitled to summary judgment. Matt Sushida demands only that the non-moving party's inferences be reasonable in order to reach the jury, a requirement which was not invented but merely articulated. So what does this mean to eliminate the possibility? As this court has held in the Ezos case, which we cite in the moving brief, and the defendants did not mention in their brief. They also didn't mention the Spirit case or Eastman-Kodak. This court said in Ezos that Matt Sushida involved in a, this is from page 1036, Matt Sushida involved in alleged conspiracy to reduce prices, which the court deemed implausible. This case involves instead the classic antitrust situation, an attempt to avoid competitive marketplace, which is what we have here, by setting prices at artificially high level, which is what our experts found, to come back to your question, Your Honor. Now, Judge Norris, we think that the expert reports are very long, and the experts did look at all this business. Professor Yavas from the University of Wisconsin has published 20 articles on real estate. They both looked at all the evidence in this case. They went over, they quoted the evidence at length, what was shown by the evidence, and they said as follows. They both made findings which were never refuted, that the Kentucky real estate commissions by these defendants were higher than multiple benchmarks, four different benchmarks, nationwide, six cities, across the river in Indiana, and other types of services. The defendants, who had far more data than we did, never came in with anything to say, our rates are the same as anywhere else. Pass us by, nothing to worry about. They didn't refute it, and they didn't give an explanation, and they didn't mention it in their brief on this court. So, what the experts found was, the pricing in the market is out of line compared to nationwide, and next, the structure in the market. During the class period from 2001 to 2005, houses were going up. Dr. French, who is not a professor, but is a Ph.D. in economics, and familiar with business, analyzed defendants' semen in 1999 to 2004, found that their costs were going down as a percentage of revenues, their profit margin was going up, and they were maintaining their percentage commissions. What could cause that? Why do your profit margins go up in this type of environment? Well, what had happened? They weren't competing on the, go back to the transcript, the DOJ brought, I believe, brought suit on the basis of, they weren't competing on the basis of price because they expressed to one another, don't compete on the basis of price, and as house prices rose, and they maintained that same commission and didn't pass on, as Adam Smith said would happen if you're not conspiring, some of the benefits of increased profits to the customer, so everybody comes out ahead. The business does better with more profits and more volume, but the customer does better. When they didn't do that, they came out ahead. So, Your Honor, that's a long-winded way of saying our experts did consider the structure and the facts of the industry. This type of structure and fact analysis happens all the time, and the experts come in and say, at least on this one issue, what is the outcome of the pricing you see? Well, based on the pricing structure and the whole record, we think it's more likely part of collusion. To be totally candid, we probably went too far in the expert reports. I think they might say too much and they might get to the ultimate issue. If I used up my time here, I'm sorry. That's okay. Thank you. May it please the Court, good morning. I'm Rob McGill representing Home Services of America and Home Services of Kentucky. The district court below correctly entered summary judgment in favor of Home Services of America, Home Services of Kentucky, and all defendants. The district court, for its part, correctly applied the summary judgment standard. The plaintiffs had no direct evidence of price fixing in their case. The plaintiffs had no indirect evidence, tending to exclude the possibility that Home Services of Kentucky set its listing commissions independently. Fourth, the Home Services of Kentucky identified undisputed non-price fixing factors or explanations for the observed pricing results. And then finally, the plaintiffs had no evidence that Home Services of America itself, for its part, participated directly in any price fixing. The plaintiffs' expert testimony evidence precludes summary judgment to create a question of fact. First, with respect to the evidence that the plaintiffs' experts provided, it was conclusory. And the district court properly concluded that it was conclusory in respect that the district court decided, with respect to each expert, that they were offering the ultimate opinion. They didn't exclude the entire. He just excluded part of it, correct? Agreed. He excluded part of it. Now, with respect to what remained, they did not create an issue of fact, and they didn't show any evidence, indirect or direct, that tended to exclude that the pricing was set independently. We can give an example. Here's the example. With respect to how they characterized the market for their part, the plaintiffs characterized the market as a market involving three characteristics. One, a market that was concentrated. Two, it was a market that had inelastic demand. And three, it was a homogenous product. With respect to their expert testimony, they did not exclude conscious parallelism as an explanation. So for that reason alone, Your Honor, with respect to how your plaintiffs in this case described their own lawsuit and the market that existed with respect to the claims that they made, there was a failure to rule out by each expert proffered by the plaintiffs. So for that reason among others, their testimony was not competent and did not create an issue of fact. There's a rule-out criterion that had to be met in accord with existing case law and in accord with what the district court decided. With respect to the way in which the district court evaluated the summary judgment motion before it, it did so properly, and it did so based on the Matsushita standard. Specifically, here's what your district court said. It said, quoting Matsushita, that conduct as consistent with permissible competition as with illegal conspiracy does not standing alone support an inference of an antitrust conspiracy. To survive a motion for summary judgment or a directed verdict, a plaintiff seeking damages for a violation of Section 1 must present evidence that tends to exclude the possibility that the alleged conspirators acted independently. That's your district court quoting the United States Supreme Court in Matsushita. The court could have looked just with the same deference to what this court has said in the In Re Travel Agents case or what this court has said in the Wallace v. Bank of Bartlett case where it described the same proof requirement imposed upon the plaintiffs, and it's a specific proof requirement. With respect to your district court and how the district court evaluated specifically its role and what it did with respect to the evidence that was produced or, in this case, not produced, the record evidence before this court shows that more than one million pages of documents were provided to the plaintiffs. More than 45 depositions were taken. Of those 45 depositions that were taken, 20 of them were of non-party brokers. With respect to those one million pages and all those depositions, there wasn't one citation that the plaintiffs could claim representing the class that there was any direct evidence of an agreement to fix prices. Not one citation. Not one memo. Not one email. Not one letter. Not one phone call. Not one in any of those respects. With respect to the indirect evidence that this court has described as necessary for plaintiffs, as these plaintiffs, to carry the burden upon, what the district court did was very cautiously and meticulously describe what it did in relation to the authority given to it by this circuit and by the United States Supreme Court. Here's what your district court said. In evaluating the evidence of an antitrust conspiracy for purposes of ruling on a defendant's motion for summary judgments, courts must be careful not to fall into the trap of concluding that if no single item of evidence presented by the plaintiffs points unequivocally to conspiracy, then the evidence as a whole cannot defeat summary judgment. Courts warning itself and all parties, I'm not falling into the trap, and it didn't. Here's what the court did. Again, with meticulous care. Here's what the district court said. The circumstantial evidence produced by plaintiffs in its totality, viewed in the light most favorable to plaintiffs, to determine whether it supports an inference that defendants had a conscious commitment to a common scheme designed to achieve an unlawful objective and that tends to exclude the possibility that defendants were acting independently. That's the district court opinion at page 30, citing Matsushita. This court couldn't have been more precise in describing exactly what the role of your district court is in these circumstances, to give the plaintiffs, as the district court said, to view that evidence in the light most favorable to the plaintiffs and to give every benefit of every doubt, every inference that existed. Now, one thing to point out relative to what the district court did. District court also acted with respect to what this court has instructed repeatedly over time in its antitrust jurisprudence and with respect to what the United States Supreme Court said in Matsushita. Here's what the district court had to deal with. And that is the fact that the standard, there are limitations on permissible inferences in antitrust cases. And your district court was well aware of this. Matsushita is quoted as saying the following. Antitrust law limits the range of permissible inferences from ambiguous evidence in a Section 1 case. So with respect to all of these circumstances, the 1 million pages, the 45 depositions, and the court's meticulous application of the standards given to it by this circuit and the United States Supreme Court, the district court found there was no evidence that they produced, no indirect evidence that they produced, which tended to exclude the independent conduct by Home Services of Kentucky and the other parties on the defendant side of the case. Your plaintiffs, on brief, your plaintiffs say that Matsushita and its rationales are not applicable to the case at bar. However, that is not correct. This circuit has said so, and circuits across the United States have said the same thing. Matsushita applies to all price-fixing cases. And the rationale of Matsushita applies with special force here. A couple of other things with respect to what this court has said, and this jurisprudence is available to all parties, plaintiffs and defendants alike. This court has described in the In Re Travel Agent decision, which we've cited on brief, a 2009 decision, what this burden of proof given to us by Matsushita means and how it gets applied. Here's what this court had before it in the In Re Travel Agent case. In that case, there were 49 travel agents that alleged certain airlines had violated Section 1 of the Sherman Act by agreeing to cut and eventually eliminate those travel agencies' commissions on airline tickets. Here's the evidence and the information that the court had in that case. The record evidence in that case that this court decided is that the airlines uniformly, both in timing and amount, decreased travel agent commissions. Second, the record in that case confirmed that they had admitted that they had a, quote, industry consensus and that that consensus was necessary for industry-wide commission cuts to hold. Third, the record in that case confirmed that those airlines watched each other's commissions cuts and matched them so as not to undercut the movement. The defendants published their commission reductions with an industry clearinghouse that could be accessed and reviewed by each and all of them. And the defendant principals responsible for setting the commissions for travel agents met frequently during the period in question. This court said, applying Matsushita, and the jurisprudence this court has consistently provided to all the parties to evaluate, is this was lawful parallel conduct. And the court said specifically that none of these facts on the record before this circuit, in those circumstances, individually or taken together, excluded or tended to exclude the possibility of independent conduct and therefore this court, the dismissal of the complaint was proper. Let me just ask you a quick question, housekeeping matter. You're sharing time, are you not? Yes, and three minutes has been reserved. Just three minutes? Just three minutes, Your Honor. And with respect to this court's decision in the Wallace v. Bank of Bartlett, we cited on brief its 1995 decision, in that case, to the same effect. This court has clearly instructed, what are the proof requirements and how do those proof requirements work in an antitrust case such as this? In the Bank of Bartlett case, the banks there admitted, with respect to the fees that were charged to customers for writing checks that were non-sufficient fund checks, the banks in that case admitted they did not set the subject fees based upon the cost of the implicated transactions. They evaluated fees those banks did, charged by other banks when they set their fees, and they did not openly compete in the amount of such fees. This circuit affirmed the summary judgment in that case in favor of the dependent banks, saying, much like it did in the In re Travel Agents case specifically, none of the above evidence, even when taken together, excluded the possibility of independent conduct. What we would respectfully submit is that is our case, and there's been every opportunity, due process in every sense in the discovery context was provided the plaintiffs and the class. The million pages, the depositions, the non-party broker depositions, and with respect to that evidence, not one piece of evidence that comprises a direct evidence of a conspiracy, and there is no evidence before this court, properly so, that tends to exclude the possibility of independent conduct as required. For those reasons, Home Services of America and Home Services of Kentucky ask that this court affirm the informed and reasoned judgment of the district court. Thank you. Thank you. May it please the court. I'm Matt Blickenstrafer on behalf of Caldwell Banker MacMahon Company. I'll be brief, Your Honors, and I'll be happy to answer any questions that you have about my client in particular, but I just wanted to address one discrete topic, barring any questions from the panel, and that is the Norr-Pennington Doctrine here. The district court did not reach the Norr-Pennington issue because it found that the plaintiff's reading of the transcript of the Kentucky Real Estate Commission hearing was, quote, unreasonable, quote, highly strained, and, quote, out of context. But despite the fact that the district court did not reach the Norr-Pennington issue, the conduct at that hearing was clearly immunized and not competent evidence at the summary judgment stage under the Norr-Pennington Doctrine. The Norr-Pennington Doctrine, of course, prohibits antitrust liability based on petitioning activity of the government, including the activities of competitors in asking for action at the state level and at the agency level. And that's exactly what we had here, Your Honors. Competitors who were speaking on a subject that was of interest to them and that was of a regulation of their industry had a public meeting that was transcribed of the Kentucky Real Estate Commission. The plaintiffs don't dispute those general propositions about Norr-Pennington immunity. Instead, they say that this falls within the sham exception, which, as I'm sure the court is aware, is an extremely narrow exception to the First Amendment protection provided by Norr-Pennington immunity and applies only when the action is not genuinely aimed at procuring favorable government action. There is no evidence in this record that any speaker wasn't trying to accomplish something vis-à-vis the rebate rule that was the subject of that meeting. And the other point to make about the meeting, Your Honors, is that this was a meeting about a regulation that governed what brokers could do with their commissions. Of course, they were going to talk about commissions when they were lobbying for or against or for an amendment to a regulation that governed what they could do with their commissions. And it's for that reason that this was protected, constitutionally protected conduct that was not admissible at the summary judgment stage, notwithstanding the district court's correct finding that the plaintiff's reading of the transcript was unreasonable. I would just further point out that the antitrust laws, of course, penalize conduct, not speech. And there is not a shred of evidence in this record that any conduct resulted from this meeting that would violate the antitrust laws. In fact, the plaintiff's own expert, Professor Yavis, found that during the class period, which began just a few months after this meeting of the Kentucky Real Estate Commission, that Caldwell Banker MacMahon's average commissions declined over the class period from an average level of about 5.5% to slightly under 5% by the end of the class period. That finding by the plaintiff's own expert is entirely inconsistent with their conspiracy theory, not only for Caldwell Banker MacMahon, but also for the home services defendants with which Caldwell Banker MacMahon is alleged to have conspired. On this public hearing privilege, I can't see that you raised that as a defensive assignment of error. We did not raise it. We did not cross-appeal, Your Honor. We don't believe we have to, Your Honor, because it's raised as an alternative basis for affirming the judgment of the district court. It was presented at the summary judgment stage, and I believe under this court's precedence, Judge Norris, that it's an alternative basis for affirming. All right. But the court didn't rule on it. It did not rule on it. We're not seeking any change in the judgment. No, I understand that. We appreciate your argument. Thank you. With respect to the large discovery record and the transcript, and also it relates to the Norr-Pennington Doctrine, which is reviewed under 403, balancing and isn't only limited by sham exception. Norr-Pennington always lets in comments and statements that go beyond the purpose and could relate to monopoly, price fixing, et cetera. The transcript did reflect a unity of purpose between, and is the discovery that Mr. McGill was talking about, purpose of Mr. McMahon, don't cut commissions. Purpose of Mr. Myers, don't compete on the basis of commissions. So that's the unity of purpose. Next, common design or understanding. The most unprofessional thing we do, our commissions, that's a common design. That goes beyond unity of purpose, Mr. Myers. We shouldn't compete on our fees. I'd like to call it our fees instead of our commissions. A reasonable juror could find that there was a meeting of the minds. No, the conduct did not change afterwards, but our experts analyzed the conduct. It was higher than the rest of the country. And why was it higher than the rest of the country? Because the Internet didn't make the inroads. That's a simple thing to say in an argument. I withdraw that. That's too glib. But certainly a reasonable juror could infer that the uncontested evidence that the prices were higher was due to this agreement, and it's totally consistent. Now, on Judge Norris, your point about the experts, I think that comes right into this. When Mr. McGill was talking about the Wallace case, which is what bundle of services does a bank offer? Do they want to have people who bounce checks? It was a case where they fixed the bounce check fee. Nobody wants to bring in and have the lowest charge for bounce checks. That was like Matsushita. It was a foolish case. Or the travel agent case, there was no transcript in that case. Now, where's the case with the transcript? Where's the case with experts who say that this is the result of price fixing, who say this is the only place that's higher than every place else? Those cases didn't have it. Where we had that was in the Remax decision. In Remax, the testimony wasn't a transcript. The testimony was, well, he denied that they did this pursuant to an agreement, but he winked. And this court found that one form of communication is wink or expressions while you talk, and that was a jury issue. The case was vacated on summary judgment and remanded for trial to find out whether that testimony would be accepted by a reasonable juror. Well, if a wink but a statement that's against the unity of purpose or common design worked there, certainly a transcript that shows explicitly this should work here, followed by the conduct afterwards. As to inelastic conduct, as to inelastic situation, the marathon case by this court said where it's inelastic, that merits more attention from our court to make sure something isn't going wrong. Everyone agrees the services were homogenous. I think I've hit my time limit. You're all right. Thank you. You have, but we thank both of you, all three of you, actually, for your arguments today. We appreciate them. The case will be submitted, and I think that concludes our oral argument calendar. Other cases are being submitted on the briefs, so you may adjourn.